FILED
CLERK

9:39 am, Feb 06, 2017

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x

AMERICAN BIRD CONSERVANCY, DAVID A. KRAUSS, AND
SUSAN SCIOLI,

                         Plaintiffs,

   -against-

ROSE HARVEY, Commissioner, New York Office of Parks,
Recreation, And Historic Preservation,

                         Defendant.

--------------------------------------------------------------------------------x

**Memorandum of
Decision & Order**
16-cv-1582 (ADS)(AKT)

<u>APPEARANCES:</u>

**Goodwin Procter LLP**
*Attorneys for the Plaintiffs*
The New York Times Building
620 Eighth Avenue
New York, NY 10018
        By:   Jeffrey A. Simes, Esq.
               Glenn S. Kerner, Esq.
               Jordan D. Weiss, Esq.
               Shaun P. DeLacy, Esq., Of Counsel

**Office of the New York State Attorney General**
*Attorneys for the Defendant*
120 Broadway, 26th Floor
New York, NY 10271
        By:   Mihir A. Desai
               Norman Spiegel, Assistant Attorneys General

**Hunsucker Goodstein P.C.**
*Attorneys for Amicus Curiae Alley Cat Allies*
5335 Wisconsin Avenue, NW, Suite 360
Washington, DC 20015
        By:   Michael D. Goodstein, Esq.
               Anne E. Lynch, Esq., Of Counsel

**SPATT, District Judge:**

        In this case, a wildlife conservation group claims that acts and omissions by the State Parks

Commissioner have led to a situation where feral cats at Jones Beach are posing a risk to a

threatened species of wild bird.

The group contends that this situation violates the federal Endangered Species Act (the "Act"), 16 U.S.C. § 1531 *et seq.*, and requires remedial action to remove the cats and thereby restore suitably protective conditions for the birds.

Presently before the Court is a motion by the Commissioner to dismiss this action on the ground that the Plaintiffs lack standing to sue under Federal Rule of Civil Procedure ("FED. R. CIV. P.") 12(b)(1), or, in the alternative, that the complaint fails to state a plausible claim for relief under FED. R. CIV. P. 12(b)(6).

For the reasons that follow, the motion to dismiss is denied.

## I.   BACKGROUND

### A.   The Relevant Statutory Provisions

Before addressing the specific facts alleged in the complaint, the Court finds that it will be helpful to identify certain relevant provisions of the federal legislation forming the basis of this case.

Enacted with a Congressional recognition that some species of fish, wildlife, and plants in the United States have been, and are being depleted in such numbers that their continued existence is in question, *see* 16 U.S.C. § 1531(a), the Endangered Species Act "contains a variety of protections designed to save from extinction species that the Secretary of the Interior designates as endangered or threatened," *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 690, 115 S. Ct. 2407, 2409, 132 L. Ed. 2d 597 (1995).

Under the statute, an "endangered species" is one "which is in danger of extinction throughout all or a significant portion of its range . . ." 16 U.S.C. § 1532(6). A "threatened species" is one that is likely to become an endangered species within the foreseeable future. *See id.* § 1532(20). With respect to wildlife falling under either of these classifications, the Act prohibits any person from "taking" such species within the United States or its territorial seas. *See id.* § 1538(1)(B).

To "take" a species means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect [it], or to attempt to engage in any such conduct." *Id.* § 1532(19).

However, "[t]he term 'take' is to be construed liberally . . . 'in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife.' " *Strahan v. Coxe*, 939 F. Supp. 963, 983 (D. Mass. 1996) (quoting *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 784 (9th Cir. 1995)).   To that end, *the* Interior Department's implementing regulations further define "harass" and "harm," as those terms are used in the definition of "take."

For example, pursuant to the regulations, to "harass" is to commit "an intentional or negligent act or omission which creates a likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."  50 C.F.R. § 17.3.

To "harm" is to "actually kill[ ] or injure[ ] wildlife," including "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering."  *Id.*

Under the statute, any civilian may commence a civil suit on his or her own behalf to enforce the Act's provisions. *See id.* § 1540(g).

**B.     The  Facts Alleged in the Complaint**

The following facts are drawn from the complaint.   For purposes of this motion, they are accepted as true and construed in favor of the Plaintiffs.

**1.      The Parties**

The Plaintiff American Bird Conservancy is a non-profit organization dedicated to the conservation of birds in the Northern hemisphere.   Among the group's special interests is a species

known as the Piping Plover, which, for purposes of the Endangered Species Act, the United States Fish & Wildlife Service has designated as a threatened species in the Atlantic Coastal Region.

Members of the American Bird Conservancy regularly visit Jones Beach State Park for the purpose of observing Piping Plovers.  In this regard, they derive academic, recreational, aesthetic, spiritual, and other benefits from watching the courting, feeding, nesting, and chick-rearing habits of the birds.

The individual Plaintiff David A. Krauss is a resident of Manhattan and an associate professor of science at the Borough of Manhattan Community College.  Since 1983, he has led student field trips to Jones Beach to explore biodiversity and the role of parks in urban settings.  He is currently studying the foraging behavior of migratory birds, including Piping Plovers.  Further, as a member of the American Bird Conservancy, Mr. Krauss has observed Piping Plovers at Jones Beach for many years, and visits the park 15 to 20 times a year for this purpose.

The individual Plaintiff Susan Scioli, a Brooklyn resident, is also a longtime member of the American Bird Conservancy and served on its Advisory Council.  She too has observed Piping Plovers at Jones Beach for many years and regularly visits the park for that purpose.

The Defendant Rose Harvey, who is sued in this case solely in her official capacity, is the Commissioner of the New York State Office of Parks, Recreation and Historic Preservation (the "Parks Office").

**2.      The Feral Cats at Jones Beach**

Jones Beach State Park is a summer nesting site for Piping Plovers.  It is also the site of at least two feral cat colonies, both of which are located within one mile of the birds' nesting areas.  This, say the Plaintiffs, is a grave problem.

Feral cats are an invasive or non-native species to Jones Beach, and one which naturally preys on birds.  In this regard, aside from actually hunting the birds, the mere presence of feral cats can

cause substantial behavioral changes in nearby bird populations, such as a reduction in the feeding of nesting chicks and an increased likelihood of nest failure.

Particularly with regard to Piping Plovers, the complaint cites a 2009 report published by the United States Fish & Wildlife Service which identified feral cats as a threat to the continued existence of the species. Likewise, the Fish & Wildlife Service recognized several ways in which Piping Plovers are uniquely vulnerable to feral cats. For example, the birds' natural defense mechanism is to feign a broken wing to distract predators away from their nests and chicks, only to fly away at the last possible moment. But feral cats are more agile than the Piping Plovers' natural predators, often foiling the birds' instinctive escape plan. Also, young plovers roam the beach in search of food for 25 days before they become capable of flight. During this period, they are particularly exposed to cat predation.

Referring to these unique vulnerabilities, the complaint cites the same 2009 Fish & Wildlife Service report for the conclusion that Piping Plover populations are sensitive to even small declines in their numbers, and each chick represents a precious hope for the future recovery of the species.

Relevant here, the complaint also relies on a June 2015 Long Island Colonial Waterbird and Piping Plover Survey, which showed that feral cats have consistently been observed near critical Piping Plover nesting areas at Jones Beach. Similar studies performed in 2013 and 2014 also noted the presence of the cats, as well as humans feeding them.

Further, the statistics show that feral cats ordinarily roam a distance from three to nearly five-and-a-half miles from their "home." Thus, the Plaintiffs contend that the close proximity of the feral cat colonies to the Piping Plover nesting areas makes it reasonably certain that the cats are traveling to the nest sites and engaging in conduct that directly or indirectly contributes to decreases in the local bird population. In this regard, the Plaintiffs allege that the number of Piping Plover chicks fledged on Long Island increases with the number of feral cats trapped.

3.      The Alleged Unlawful Conduct by the Commissioner

Neither the Commissioner nor the agency she oversees is alleged to have engaged in any direct actions aimed at furthering the situation described above.  Rather, the crux of the Plaintiffs' complaint is that the Commissioner has stood idly by, while members of the public routinely feed, build shelters, and otherwise care for the feral cats at Jones Beach, which actions have allowed the cat colonies to flourish at the expense of the federally-protected Piping Plover.

The Parks Office allegedly grants these individuals access to Jones Beach, and has taken no identifiable action to remove the cats – this despite the fact that the Commissioner is apparently aware of the threat they pose to Piping Plovers.

For example, the complaint cites a publication, entitled "Guidelines for Feral Cat Control in State Parks," which the Parks Office itself has published.  In relevant part, the guidelines state that "Feral Cats, whether in colonies or solitary, represent a significant concern when in proximity to the threatened and endangered species such as nesting areas of species at risk (*e.g.*, Piping Plovers)."

Further, in a March 17, 2015 letter to the American Bird Conservancy, the Parks Office acknowledged the presence of feral cats at Jones Beach and agreed that its "goal should be the removal of feral cats within New York State Parks."  The complaint quotes other portions of this correspondence, including an apparent admission that "there is a 'possibility of [feral cats] harming endangered and threatened wildlife[,] particularly the Piping Plover . . .' "

C.      This Action

Based on these facts, the Plaintiffs assert a single cause of action under the Act, alleging that the Commissioner's failure to remove the feral cats from Jones Beach amounts to a tacit endorsement of their presence and the consequences that flow therefrom.  Thus, the Plaintiffs contend that, inasmuch as the Commissioner is effectively authorizing residents to maintain feral cat colonies that almost certainly prey on a threatened species, the Commissioner is causing a "take" of the Piping Plovers, in violation of the Act.  *See* 15 U.S.C. § 1538(a)(1)(B), (g).

By this action, the Plaintiffs seek: (1) a declaratory judgment finding the Commissioner, and by extension, the Parks Office, in violation of the Endangered Species Act; (2) a mandatory injunction compelling the Parks Office to discontinue any conduct that is reasonably certain to lead to the "taking" of Piping Plovers; and (3) a mandatory injunction compelling the Parks Office to remove the feral cats and their man-made housing from Jones Beach, and preventing members of the public from re-establishing similar cat colonies in the park in the future.

As noted above, on July 21, 2016, the Commissioner filed a motion to dismiss the complaint under Rule 12(b)(1) on the ground that the Plaintiffs lack Article III standing, or, alternatively, under Rule 12(b)(6) on the ground that the complaint fails to state a plausible claim for relief.

**II.    DISCUSSION**

**A.    The Standards of Review**

**I.    Subject Matter Jurisdiction under FED. R. CIV. P. 12(b)(1)**

" 'A motion to dismiss for lack of subject-matter jurisdiction under [FED. R. CIV. P.] 12(b)(1) is the appropriate mechanism for challenging a plaintiff's constitutional standing to bring a particular claim.' " *Barnett v. Countrywide Bank, FSB*, 60 F. Supp. 3d 379, 385 (E.D.N.Y. 2014) (Spatt, *J.*) (quoting *Ali v. NYC DOT*, Nos. 14-cv-312 & 14-cv-313, 2014 U.S. Dist. LEXIS 158331, at *2 (E.D.N.Y. Nov. 4, 2014)).  Although this is the Commissioner's motion, the burden is on the Plaintiffs, as the parties seeking to invoke the Court's jurisdiction, to establish that they have standing, and by extension, that subject matter jurisdiction exists.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).  In resolving this jurisdictional question, the Court may refer to evidence outside the pleadings and weigh the evidence in the record.  *See Ali*, 2014 U.S. Dist. LEXIS 158331, at *3.

2.        The Pleading Standard under FED. R. CIV. P. 12(b)(6)

Under FED. R. CIV. P. 12(b)(6), a party may move to dismiss a cause of action that "fail[s] to state a claim upon which relief can be granted."  "To survive a motion to dismiss, the complaint must plead 'enough facts to state a claim to relief that is plausible on its face,' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and 'allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)."  *Otis-Wisher v. Medtronic, Inc.*, 14-cv-3491, 2015 U.S. App. LEXIS 9565, at *2 (2d Cir. June 9, 2015).

"A motion brought under Rule 12(b)(6) challenges only the 'legal feasibility' of a complaint." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558 (2d Cir. 2016) (quoting *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006)).  Therefore, unlike a motion attacking the Court's subject matter jurisdiction, "a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence," and therefore, "a court adjudicating such a motion may review only a narrow universe of materials."  *Id.* at 559.  Specifically, in its discretion, the Court may consider " 'facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken.' " *Id.* (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

B.        The Brief Filed by Alley Cat Allies as *Amicus Curiae*

Before addressing the merits of the present dispute, the Court notes that on July 29, 2016, an organization known as Alley Cat Allies ("ACA") appeared in this action by counsel and requested permission to file papers, as *amicus curiae*, in support of the Commissioner's motion to dismiss.

According to its proposed submission – which includes a legal memorandum; a factual affidavit; and various research, literature, and other related materials – ACA is a national organization dedicated to the protection and humane treatment of cats, including feral cats, and

providing decision-makers with accurate information on cat behavior.  In general, ACA asserts that its unique expertise in the behavior and ethical treatment of cats renders its perspective on the current motion useful to the Court.

Initially, to the extent that the current motion seeks relief under Rule 12(b)(6), the Court declines to consider the factual affidavit by ACA's President and Founder Rebecca Robinson and its accompanying exhibits.  In the Court's view, this documentary evidence is clearly outside the scope of permissible supporting materials.  *See, e.g.*, *Jannazzo v. United States*, No. 15-cv-3506, 2016 U.S. Dist. LEXIS 49701, at *12-*13 (E.D.N.Y. Apr. 13, 2016) (Spatt, J.) (finding "little difficultly concluding that" an affidavit "d[id] not fall within the recognized categories of documents that are appropriate to consider on a Rule 12(b)(6) motion"); *Wilson v. Southampton Hosp.*, No. 14-cv-5884, 2015 U.S. Dist. LEXIS 116179, at *19-*20 (E.D.N.Y. Aug. 28, 2015) (Spatt, J.) (same); *Garnett-Bishop v. N.Y. Cmty. Bancorp, Inc.*, No. 12-cv-2285, 2014 U.S. Dist. LEXIS 157806, at *34 (E.D.N.Y. Nov. 6, 2014) (Spatt, J.) (same).

Further, in the only section of its proposed legal memorandum that appears to be directed at the sufficiency of the pleading – Section II, entitled "Plaintiffs' Conclusory Statements about Causation Should Not Be Taken as True" – ACA relies directly upon Ms. Robinson's affidavit to refute the facts alleged in the complaint.  *See* ACA Br. at 4-5.  However, as noted above, such arguments are improper, as "a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence."  *Goel*, 458 F.3d at 559.

When these improper arguments are set aside, what remains is a straightforward appeal to the familiar pleading standards announced in *Twombly* and *Iqbal*, which the parties' counsel are more than capable of presenting to the Court without ACA's help.  *See Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1062-63 (7th Cir. 1997) (observing that a non-party brief may be desirable where the *amicus curiae* possesses "unique perspective that can help the court beyond the help the

lawyers for the parties are able to provide"); *Andersen v. Leavitt*, No. 03-cv-6115, 2007 U.S. Dist. LEXIS 59108, at *6 (E.D.N.Y. Aug. 13, 2007) ("The primary reason to allow *amicus curiae* briefing is that the *amicus curiae* 'offer insights not available from the parties,' thereby aiding the Court" (quoting *Citizens Against Gambling v. Kempthorne*, 471 F. Supp. 2d 295, 311 (W.D.N.Y. 2007)); *see also Lehman XS Tr., Series 2006-GP2 v. Greenpoint Mortg. Funding, Inc.*, No. 12-cv-7935, 2014 U.S. Dist. LEXIS 11179, at *7-*8 (S.D.N.Y. Jan. 23, 2014) (denying leave to file an *amicus* brief partly because the plaintiffs were represented by "competent counsel that ha[d] given as good as it gets").

Accordingly, in resolving the portion of the present motion that seeks relief under FED. R. CIV. P. 12(b)(6), the Court, in its discretion, has not considered the views of ACA.

However, as noted above, extrinsic evidence may be consulted in evaluating the portion of the motion that arises under Rule 12(b)(1). In this regard, the Court notes that ACA's legal memorandum appears to set forth an argument pertaining to an essential element of the Plaintiffs' constitutional standing, namely, redressability, or the non-speculative likelihood that the Plaintiffs' injury can be remedied by the relief requested. *See Brady v. Basic Research, LLC*, 101 F. Supp. 3d 217, 228 (E.D.N.Y. 2015).

On this subject, the Court finds that ACA's specialized knowledge regarding cat behavior and the proper management of feral cat communities may be useful in assessing whether the relief sought by the Plaintiffs, namely, the removal of feral cats from Jones Beach, will succeed in remedying their alleged injury, namely, the "taking" of Piping Plovers.

In this regard, it is noted that ACA submitted evidence tending to show that human attempts to remove an animal population from its home range is not only ineffective, but may actually result in an increase in that animals' numbers. Relevant here, ACA contends that, under a theory known as the "vacuum effect," if the current feral cat colonies at Jones Beach were removed,

newly-introduced unsterilized cats, or cats that managed to elude the initial removal effort, might thrive in the now-uninhabited Jones Beach habitat.

Relying on a 2002 article from the *South African Journal of Wildlife*, which is not itself a part of the record, ACA cites the cat-removal effort that took place in 1975 on the sub-Antarctic Marion Island as proof that, even arguably successful removal efforts can prove costly, inhumane, and can take years to implement.  According to a summary of the relevant events published by ACA, the only documented example of cats being permanently removed from their habitat occurred on the "tiny, uninhabited sub-Antarctic" landmass known as Marion Island.  There, it took approximately 19 years, from 1975 to 1994, of varying removal methods, including poisoning, hunting, trapping, and introducing viruses to the locale before all 2,500 of the feral cats were cleared from the island.  ACA contends that these methods – even if they were not questionable by modern standards of ethical wildlife treatment – could never be replicated in a densely-populated place like Long Island. Inevitably, says ACA, the removal effort sought by the Plaintiffs in this case would fail and the cats would immediately repopulate Jones Beach.  For these reasons, ACA believes that the Plaintiffs are unable to show the requisite redressability needed for Article III standing.

With this additional information in mind, the Court turns to the merits of the present dispute.

**C.    As to Whether the Plaintiffs Have Standing to Maintain this Action**

As noted above, the Act contains a citizen-suit provision, which creates a private right of action for individuals seeking to enforce the statute.  However, the Supreme Court has clarified that this provision does not confer standing on every person possessing a generalized "public interest in [the] proper administration of the laws."  *Lujan*, 504 U.S. at 576; *see Vt. Pub. Interest Research Grp. v. United States Fish & Wildlife Serv.*, 247 F. Supp. 2d 495, 508 (D. Vt. 2002) (noting that "those with merely generalized grievances" are precluded "from bringing suit to vindicate an interest common to the entire public" (citation and quotation marks omitted)).  Rather, a plaintiff seeking redress under

the Act pursuant to the citizen-suit provision must nevertheless meet the usual standard for Article III standing.

I.      **The Applicable Legal Principles**

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

"Pursuant to Article III, § 2 of the United States Constitution, the jurisdiction of the federal courts is limited to 'Cases' and 'Controversies,' which 'restricts the authority of the federal courts to resolving 'the legal rights of litigants in actual controversies.'" *Lary v. Rexall Sundown, Inc.*, 74 F. Supp. 3d 540, 543-44 (E.D.N.Y. 2015) (quoting *Genesis Healthcare Corp. v. Symczyk*, __ U.S. __, 133 S. Ct. 1523, 1528, 185 L. Ed. 2d 636 (2013)). "Thus, federal courts require that a party have a legally cognizable interest in a case's outcome to 'ensure[ ] that the Federal Judiciary confines itself to its constitutionally limited role in adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved.'" *Id.* at 544 (quoting *Symczyk*, 133 S. Ct. at 1528); *see Evans v. Hills*, 537 F.2d 571, 591 (2d Cir. 1975) ("The hallmark of a case or controversy is the presence of adverse interests between parties who have a substantial personal stake in the outcome of the litigation").

Thus, "[s]tanding to sue, in the Constitutional sense, 'is the showing by a plaintiff that his particular grievance meets this standard, the 'essence of which is the presence of 'injury in fact' suffered by the plaintiff as a result of the defendant's actions.'" *Brady*, 101 F. Supp. 3d at 227 (quoting *Evans*, 537 F.2d at 591). Relevant here, " 'Article III standing consists of three 'irreducible' elements: (1) *injury-in-fact*, which is a 'concrete particularized' harm to a 'legally protected interest'; (2) *causation* in the form of a 'fairly traceable' connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) *redressability*, or a non-speculative likelihood that the injury can be

remedied by the requested relief.' " *Id.* at 228 (quoting *In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 570, 574 (S.D.N.Y. 2009)) (emphasis in original).

"Standing is an essential component of a plaintiff's case, and therefore must be supported with evidence sufficient to meet the standard required at the various stages of litigation." *Elliott v. City of New York*, No. 06-cv-296, 2010 U.S. Dist. LEXIS 131334, at *32 (S.D.N.Y. Nov. 15, 2010) (citing *Lujan*, 504 U.S. at 561), *aff'd*, 2012 U.S. App. LEXIS 19735 (2d Cir. Sept. 20, 2012); *see Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (noting that "the showing that must be made in order to withstand a dismissal for lack of standing increases as the suit progresses").

What this means is that, whereas a plaintiff whose standing is challenged by way of a summary judgment motion must respond with competent evidence sufficient to pass muster under FED. R. CIV. P. 56, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice." *Carter*, 822 F.3d at 56.

Where, as here, the Defendant's motion to dismiss is facial – that is, based solely on the allegations in the complaint – "the plaintiff has no evidentiary burden" and "[t]he task of the district court is to determine whether the Pleading 'allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue.' " *Id.* (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011), *cert. denied*, __ U.S. __, 133 S. Ct. 1586, 185 L. Ed. 2d 578 (2013)). In carrying out this task, the Court presumes that general allegations embrace more specific facts that are necessary to support the claim. *See id.*

### 2.     Application to the Facts of this Case

#### a.     The First Element: Injury-in-Fact

In general, an injury-in-fact "must be concrete and particularized, and actual or imminent, not conjectural or hypothetical." *Elliott*, 2010 U.S. Dist. LEXIS 131334, at *31 (citing *Lujan*, 504 U.S. at 351). This requires a showing that the Plaintiffs themselves are among the injured. *See id.* at *31-*32

(citing *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972)); *see Lujan*, 504 U.S. at 563 (noting that "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured' " (quoting *Sierra Club*, 405 U.S. at 734-35)).

"The 'injury in fact' requirement in an environmental case is satisfied if a party adequately shows that he has an aesthetic or recreational interest in a particular place or animal, and that interest is impaired by a defendant's conduct." *Nat'l Wildlife Fed'n v. Norton*, 386 F. Supp. 2d 553, 560 (D. Vt. 2005).   To be sure, is well-settled that "[h]arm to a plaintiff's aesthetic and recreational interests can give rise to an injury-in-fact and thereby satisfy the requirements for standing." *Elliott*, 2010 U.S. Dist. LEXIS 121334, at *32; *see Lujan*, 504 U.S. at 562 ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing"); *Aiello v. Town of Brookhaven*, 136 F. Supp. 2d 81, 105-06 (E.D.N.Y. 2001) (collecting cases to show that "the Supreme Court has determined in a number of environmental suits that harm to aesthetic interests is a valid basis to constitute an injury in fact").

For example, in *National Wildlife Federation v. Norton*, a group of conservationists commenced an action challenging the decision of the Fish & Wildlife Service to downgrade, for purposes of the Act, the gray wolf from an endangered species to a threatened species in certain parts of the United States.   Relevant here, in addressing whether these groups had standing to enforce the Act's provisions, the district court reasoned that: "Plaintiffs' members have an aesthetic and recreational interest in observing the gray wolf because they are involved in activities in and around the gray wolf's habitat and have devoted substantial amounts of time in support of wolf recovery and in pursuit of the wolf throughout the Northeast." 386 F. Supp. 2d at 560.   "[T]herefore, the plaintiffs ha[d] demonstrated 'injury in fact,' " said the court, even though the individual plaintiffs had never actually seen a gray wolf. *Id.*

In a subsequent case also involving attempts by the Fish & Wildlife Service to reclassify the gray wolf in nine Midwestern States, the district court again found that several conservation groups had standing to sue under the Act.  *See generally Humane Soc'y of the United States v. Jewell*, 76 F. Supp. 3d 69 (D.D.C. 2014).  Arising in the context of a summary judgment motion, the court considered the affidavits of four individual group members, one of whom claimed to have made twenty-five trips into a particular area of Minnesota hoping to encounter and observe gray wolves, and planned to continue these trips in the future.  He had never seen a gray wolf, but had either heard wolves nearby or seen evidence of their presence on more than one occasion.

Another claimed to have spent much of her vacation time hiking in northern Minnesota, where, although she liked to take nature photographs and do pencil illustrations of the local environs, the opportunity to view gray wolves and other wildlife was her main reason to hike trails in that part of the country.  She often looked for wolf tracks and had seen wolves on more than one occasion.

Although these individuals had only rarely, if ever, seen the object of their conservationism, the district court found that their averments "indisputably established, at the very least, an aesthetic interest in the preservation of the gray wolf in the area affected by" the Fish & Wildlife Service's proposed reclassification.

A third plaintiff apparently moved to the Western Upper Peninsula of Michigan based primarily on its abundance of wildlife, and claimed that a pack of wolves, with whom she developed a relationship of sorts, had claimed a portion of her property as part of its territory.  To her dismay, she assertedly witnessed the carcasses of wolves that had been hit by cars or illegally shot.  A fourth plaintiff claimed that he had on several occasions visited wilderness areas in Minnesota where known gray wolf populations lived, and had seen and heard wolves during these trips – experiences that he considered a thrill and great privilege.  As a result of the planned reclassification, which

would apparently permit some hunting of the wolves, this plaintiff claimed that he would be forced to plan his visits with a view toward avoiding the activities of hunters and trappers.

Based on these accounts, the district court held that each of the declarants had "stated that he or she makes affirmative efforts to seek out and enjoy wolves in nature, will continue to do so, and, at least in [one] case, adjust his behavior because of the practices allowed under state management that were not allowed under the previously existing federal ESA protections." *Id.* at 107. Consequently, the court held that the conservation groups had successfully "made the requisite showing that their membership includes persons who have alleged sufficiently a concrete and particularized 'injury in fact.'" *Id.*

Applying these standards, the Court concludes that the allegations in the complaint, taken as true, set forth sufficient facts to make it plausible that the Plaintiffs are among those who are or will be injured by the alleged "taking" of the Piping Plovers at Jones Beach.

Initially, in the Court's view, there can be no question that the Plaintiffs sufficiently allege a cognizable interest in the conservation of Northern hemispheric birds generally, and the preservation, protection, and recovery of the Piping Plover species in particular. The complaint alleges that the American Bird Conservancy and its individual members derive academic, recreational, and aesthetic benefits from observing and studying the courting, feeding, nesting, and chick-rearing habits of the Piping Plovers at Jones Beach – interests which, as noted above, are protectable for purposes of establishing standing.

The Commissioner concedes this point, appropriately noting that the critical inquiry is not simply whether such an interest exists, but whether the complaint contains facts which plausibly suggest that this interest has been or will imminently be injured. *See* Def. Memo of Law at 7 (arguing that, although the "Plaintiffs may have an interest in bird conservancy, and even the Piping Plover," the complaint does not plausibly allege that they have "suffered, or will imminently suffer, any specific injury to their organizational or individual interests").

In addressing this issue, the Court is mindful that "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000).  Thus, the Commissioner's argument is well-taken that the complaint appears to lack specific examples of harm befalling Piping Plovers at Jones Beach, and therefore, ways in which such harm has concretely affected the Plaintiffs' interests in the birds.

However, at this early stage of the case, when the Plaintiffs are not only entitled to have their complaint read liberally in the light most favorable to them, but also to rely on unproven allegations to survive a jurisdictional challenge, the Court concludes that the allegations in the complaint, if proven, could support the plausible inference that: (1) Piping Plovers at Jones Beach are at imminent risk of predation by the park's feral cat population; and (2) accepting the premise that they derive a protectable interest from the birds, the Plaintiffs are at a concomitant risk of suffering an injury in fact by the depletion of the species.  *See Lujan*, 504 U.S. at 566 ("It is clear that the person who observes or works with a particular animal threatened by a federal decision is facing perceptible harm, since the very subject of his interest will no longer exist"); *cf. Vt. Pub. Interest Research Grp.*, 247 F. Supp. 2d at 509 (noting that "injury in fact exists where the agency 'conduct threaten[s] to diminish or deplete the overall supply of endangered animals available for observation and study" (quoting *Humane Soc'y of the U.S. v. Babbitt*, 46 F.3d 93, 97 (D.C. Cir. 1995)).

In reaching this conclusion, the Court relies on the following allegations in the complaint, which, for present purposes, are accepted as true:  feral cats are presently coexisting at Jones Beach with federally-protected Piping Plovers.  As a non-native species, which naturally preys on birds, the feral cats pose a mortal danger to the Piping Plovers – a fact which the Parks Office has acknowledged in its published guidelines and correspondence with the American Bird Conservancy.

This danger to the birds is manifested directly, through actual predation, and indirectly, as the mere presence of the cats has deleterious secondary effects on the Plovers' critical feeding and chick-rearing habits.  Further, due to their unique vulnerabilities, the cats threaten the continued existence of the entire Piping Plover population at Jones Beach.

It is true, as the Commissioner asserts, that the complaint does not specifically allege any examples of actual harm befalling the birds.  However, this fact was not dispositive in the cases of *Norton* and *Jewell*, where, even before the challenged government actions, several of the plaintiffs had never even witnessed a live specimen of the species their conservation efforts aimed to protect, let alone the "taking" of that species.  *See also Sierra Club v. Lyng*, 649 F. Supp. 1260, 1270-71 (E.D. Tex. 1988) (" 'Harm' does not necessarily require proof of the death of specific or individual members of the species" (citations omitted)).

Rather, in those cases, in order to make out an actualized injury, it was enough that the plaintiffs had a commitment to the protection and recovery of the species – as shown partly through past efforts to observe the animals, and future plans to do so – coupled with the likely effects that downgrading gray wolves from an "Endangered Species" to a "Threatened Species" would have on their survival.  *See also National Audubon Society v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002) (in a case brought by bird enthusiasts to challenge a State ban on certain types of steel traps used to catch foxes and other predators, the court found that the injury to the plaintiffs' aesthetic, recreational, and scientific interests "was actual and imminent as soon as the traps were removed because the bird population was exposed to immediate risk of harm").

In this case, taken together, the Court finds that the allegations in the complaint support a plausible inference of harm to the survival of the Jones Beach Piping Plovers, and, by extension, the Plaintiff's protected interests in them.  For example, the feral cat colonies are located well within the roaming radius of the cats, and predatory feral cats have consistently been documented near the birds' nesting areas.

Further, the allegations relating to Krauss and Scioli's interests in the birds – particularly their regular excursions to Jones Beach to observe and study the species; their expectation of continuing to do so; and their concern over feral cat sightings in federally-protected nesting areas and the natural consequence thereof – are sufficient to support the plausible inference that, if the Piping Plover population is being depleted as alleged, the Plaintiffs' aesthetic and recreational value in those birds will be lessened.  *See Vt. Pub. Interest Research Grp.*, 247 F. Supp. 2d at 509 (plaintiffs claiming aesthetic and recreational interests in a local tributary and its fauna showed sufficient injury-in-fact to challenge the release of pesticides into the waterway by asserting that their "ability to observe and study the wildlife and biodiversity of [the tributary] will  be lessened if [local species] are lost of diminished.  This is because these populations will either be harder to find or non-existent in the creek").

Under these circumstances, the Court finds that the complaint sufficiently alleges an injury in fact to satisfy the first element of the standing analysis.

###### b.      The Second Element: Causation

"To satisfy the causation requirement, the alleged injury must be 'fairly traceable to the actions of the defendant.' "  *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 345 (2d Cir. 2009) (quoting *Bennett v. Spear*, 520 U.S. 154, 162, 117 S. Ct. 1154. 137 L. Ed. 2d 281 (1997)).  "This requirement 'ensures that there is a genuine nexus between a plaintiff's injury and a defendant's alleged . . . conduct,' and 'is in large part designed to ensure that the injury  complained of is 'not the result of the independent action of some third party not before the court.' '  *Id.* (quoting *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000)); *see Nat'l Wildlife Fed'n v. FEMA*, 345 F. Supp. 2d 1151, 1162 (W.D. Wa. 2004) (noting that [t]he second 'causation' element 'is only implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant' " (quoting *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 975 (9th Cir. 2003)).

"[T]he Supreme Court has established a low causation threshold for standing purposes, stating that a 'substantial likelihood' that defendant's actions caused plaintiff's harm confers standing." *DMJ Assocs., L.L.C. v. Capasso*, 288 F. Supp. 2d 262, 272 (E.D.N.Y. 2003) (citing cases).  In this regard, "what matters is not the 'length of the chain of causation,' but rather the 'plausibility of the links that comprise the chain.' " *See Nat'l Audubon Soc'y*, 307 F.3d at 849 (quoting *Autolog Corp. v. Regan*, 731 F.2d 25, 31 (D.C. Cir. 1984)).

For example, in *National Audubon Society v. Davis* – a case that, similar to this one, "pit[ted] bird-lovers, seeking to protect endangered and threated species, against fox-lovers, seeking to protect predators from inhumane traps" – the court held that a sufficient nexus had been shown between the alleged injury to the plaintiffs' interests in protecting birds, and a voter initiative that outlawed the use of steel-jawed traps to catch foxes and other predatory species.  In reaching this conclusion, the court reasoned that:

> [T]he plaintiffs' injury is 'fairly traceable' to Proposition 4 because the federal government removed traps in direct response to Proposition 4 . . . Removal of the traps leads to a larger population of predators, which in turn decreases the number of birds and other protected wildlife.  This chain of causation has more than one link, but it is not hypothetical or tenuous . . .

307 F.3d at 849 (citation omitted).

In the Court's view, similar reasoning is appropriate here.

The Court's analysis necessarily begins from the undisputed fact – the "general truism," as the Commissioner puts it – that "cats kill birds."  *See* Def. Memo of Law at 9.  From this starting point, and accepting the allegations in the complaint as true, it takes only modest logical progressions to reach the conclusion set forth by the Plaintiffs, namely, that failing to remove feral cats from Jones Beach leads to a larger population of the predators, which in turn decreases the number of Piping Plovers from which the Plaintiffs can derive pleasure.

If, as the Plaintiffs allege, "the Parks Office is the only entity authorized to remove the feral cats from Jones Beach, and the only entity authorized to control access of members of the public to the area to build shelters and/or feed feral cats," Compl. ¶ 38, then the Commissioner's failure to take such measures represents the causative link needed to connect her actions and/or inactions to the Plaintiffs' harm.  As was true in *National Audubon Society*, the Court finds that, although this chain of causation has more than one link, it is neither hypothetical nor tenuous.  In this Court's view, it is certainly not implausible.

Accordingly, the Court finds that the complaint sufficiently alleges that the Plaintiffs' injury is fairly traceable to conduct by the Commissioner so as to satisfy causation, the second element of the standing analysis.

### c.    The  Third Element: Redressability

The third and final element of the standing inquiry is redressability, which "requires a court to determine whether it possesses the ability to remedy the harm that a petitioner asserts."  *Nat'l Wildlife Fed'n*, 345 F. Supp. 2d at 1165 (citing *Citizens for Better Forestry*, 341 F.3d at 975-76).  In this regard, as noted above, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' "  *See Lujan*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43, 96 S. Ct. 1917, 48 L. Ed. 2d 450 (1976)).

As to this issue, the Commissioner contends that the complaint fails to plausibly allege that removing the feral cats from Jones Beach will affect the Piping Plover population.  In the Court's view, this argument lacks merit.

Initially, it seems self-evident that removing a natural predator from the vicinity of the birds' nesting areas will contribute positively to the survival rate of the local species.  In this regard, the complaint clearly alleges that "the number of Piping Plover chicks fledged on Long Island increased with the number of feral cats trapped."  Compl. ¶ 27.  Further, despite her current protestations, the

Commissioner does not dispute that the Parks Office has previously acknowledged that, due to the "possibility of [feral cats] harming endangered species and threatened wildlife[,] particularly the Piping Plover" at Jones Beach, its "goal should be the removal of feral cats within New York State Parks." *Id.* ¶ 31. Thus, assuming the truth of these statements, the Court finds it to be plausible that the relief sought in this case will lessen the number of federally-protected birds falling victim to the cats, and thereby redress the Plaintiffs' alleged injuries.

The Court's reasoning is not altered by the Commissioner's assertion that the Plaintiffs' theory fails to account for other possible threats to the Piping Plovers, including predatory species such as skunk and fox. In this regard, the Commissioner implies that, even if the feral cats are removed, the Piping Plover population may still fall prey to other animals.

However, there is no evidence in the record relating to the alleged threat posed by these or any other non-feral cat species, and the assertions contained in the Commissioner's legal memorandum are insufficient to refute the Plaintiffs' allegations at this juncture. *See, e.g., Russo v. New York Presbyterian Hosp.*, No. 09-cv-5334, 2011 U.S. Dist. LEXIS 28202, at *13 (E.D.N.Y. Mar. 3, 2011) (noting that on a motion to dismiss, "a court considers only the allegations made in the complaint and any documents attached thereto, and thus disregards allegations made in a memorandum of law" (citations omitted)).

Further, in order to establish their standing to challenge the Commissioner's conduct as it relates to the feral cats, the Plaintiffs are not required in their pleading to positively eliminate all other potential sources of injury to the birds. Rather, as noted above, they must only allege enough facts to make it plausible "that a favorable decision will relieve a discrete injury to [them]. [They] need not show that a favorable decision will relieve [their] *every* injury." *See Larson v. Valente*, 456 U.S. 228, 243 n.15, 201 S. Ct. 1673, 72 L. Ed. 2d 33 (1982) (rejecting an "overly 'draconian interpretation" of this standard") (emphasis in original)).

Thus, even if the Commissioner is correct that, in the absence of the feral cats, some portion of the Piping Plover population will inevitably fall victim to other natural predators, this fact alone does not divest the Plaintiffs of standing to challenge the cats' presence at Jones Beach.

Nor is the Court's reasoning altered by ACA's explanation of the difficulties inherent in a removal effort of the type sought by the Plaintiffs.  At best, ACA's submission raises a number of factual questions regarding the feasibility and effectiveness of the relief sought, which are inappropriate for the Court to consider on an undeveloped record at the motion-to-dismiss stage.

Initially, it is noted that the Plaintiffs have no obligation to respond to ACA's submission with factual support for their allegations.  ACA is not a party to this action, and, therefore, wields limited authority to require the Plaintiffs to respond to its assertions.  *See Citizens Against Gambling*, 471 F. Supp. 2d at 311 (noting that "an *amicus curiae* is not a party and has no control over the litigation and no right to institute any proceedings in it, nor can it file any pleadings or motions in the case" (quotation marks and citation omitted)).

Further, in the Court's view, ACA's supporting materials trigger no evidentiary burden on the part of the Plaintiffs because they are insufficient to render the allegations in the complaint implausible.  *See Carter*, 822 F.3d at 57 (noting that, where a fact-based challenge is made against a plaintiff's standing, the plaintiff only "need[s] to come forward with evidence of [his] own to controvert that presented by the [movant] 'if the [evidence] submitted on a Rule 12(b)(1) motion . . . reveal[s] the existence of factual problems' in the assertion of jurisdiction.  However, the plaintiffs are entitled to rely on the allegations in the Pleading if the evidence proffered by the [movant] is immaterial because it does not contradict plausible allegations that are themselves sufficient to show standing" (underscore in original) (citation omitted)).

In any event, with respect to redressability, ACA does not appear to dispute the general proposition that reducing the feral cat population at Jones Beach would succeed in safeguarding the Piping Plovers.  Rather, the crux of ACA's position is apparently that one particular method of

stabilizing the feral cat population, namely, a technique known as "Trap, Neuter, Return," is preferable to other, less humane methods of removal, such as trapping and expulsion en masse. Therefore, even accepting ACA's general view that the relief sought by the Plaintiffs is difficult to effectuate and may prove to be below prevailing standards of ethical wildlife treatment, the appropriate remedy would still not be dismissal of the complaint because the group has not shown that such relief is purely speculative and unlikely to provide redress for the Plaintiffs' injuries.

Alternatively, the Commissioner argues that redressability is lacking because the Endangered Species Act imposes no duty on the Parks Office to remove the feral cat colonies at Jones Beach or otherwise prevent members of the public from feeding and caring for the cats, even if such conduct by third-parties constitutes a violation of the statute. *See, e.g.*, Def. Memo of Law at 18 (arguing that the complaint fails to plausibly allege that the Parks Office "has a duty under the ESA to remove the feral cats from Jones Beach . . . or to prevent third parties from committing possible violations under the ESA").

For this theory, the Commissioner relies upon the Second Circuit's decision in *New York Coastal Partnership, Inc. v. United States Department of the Interior*, 341 F.3d 112 (2d Cir. 2003), *cert. denied*, 546 U.S. 820, 126 S. Ct. 352, 163 L. Ed. 2d 61 (2005).

That case arose out of federal legislation known as the Fire Island Seashore Act, under which the United States Department of the Interior ("DOI") and the Army Corps of Engineers ("ACE") were given primary responsibility for conserving and preserving the Fire Island coastline, including beaches where the Piping Plover nests. In furtherance of this charge, the DOI and ACE developed a plan that would, in theory, control shore erosion on Fire Island. However, when the project was deemed too expensive to implement, it was abandoned. Thereafter, several like-minded advocacy groups – including conservationists of varying stripes and homeowners claiming that beach erosion threatened to destroy their property – commenced an action to compel various government officials to implement the plan.

The plaintiffs asserted a multitude of legal theories, among them a claim under the Endangered Species Act that the environmental consequences of beach erosion included the destruction of the Piping Plovers' nesting habitat.  This, said the plaintiffs, amounted to an illegal "taking" of the birds.

The Second Circuit affirmed dismissal of the complaint on the ground that the plaintiffs lacked standing to sue – more specifically, the court could not conclude that the remedy the plaintiffs sought, namely, implementation of the proposed shore erosion plan, would likely redress the injuries of which they complained.

In this regard, the court gave three reasons why redressability was lacking: (1) there was apparently no statutory authority requiring the defendants to adopt the proposed plan; (2) even if such a statutory obligation existed, there was no indication that the plan would so succeed in combating shore erosion that the plaintiffs' varied injuries would be remedied; and (3) the proposed plan was only temporary, so that even if it proved effective at controlling shore erosion, it would quickly be replaced with an as yet undeveloped plan that the court could only speculate would also succeed at redressing the plaintiffs' injuries.

Specifically with regard to the claim based on the Endangered Species Act, the court again reasoned that, "[w]hile there is support for the notion that omissions – in the face of a duty to act – may constitute violations" of the statute, the plaintiffs had not identified any duty requiring the defendants to act in a manner that would likely redress the plaintiffs' alleged injuries.

Relying on this conclusion, the Commissioner asserts that, in the absence of a specific statutory duty requiring the Parks Office to take some action with respect to the feral cats at Jones Beach, the Plaintiffs cannot establish the redressability needed to support standing to maintain this suit.  The Court disagrees.

Initially, drawing all inferences in the Plaintiffs' favor, the Court assumes that the Act imposes on governmental agencies, including the Commissioner, a broad affirmative duty to take

such measures as are reasonably necessary to protect threatened species within their jurisdictions. *See* 16 U.S.C. §§ 1531(a)(4) (declaring that the United States "has pledged itself . . . to conserve to the extent practicable the various species . . . facing extinction"); *id.* § 1531(b) (noting that a primary purpose of the Act is "to provide a program for the conservation of . . . endangered species and threatened species"); *id.* § 1532(3) (defining "conservation" as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary"); *see also Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 177, 98 S. Ct. 2279, 57 L. Ed. 2d 117 (1978) (noting that "[t]he dominant theme pervading all Congressional discussion of the proposed [Endangered Species Act of 1973] was the overriding need *to devote whatever effort and resources were necessary* to avoid further diminution of national and worldwide wildlife" (emphasis in original) (citation omitted)); *Palila v. Hawaii Dept' of Land & Natural Resources*, 639 F.2d 495, 497 (9th Cir. 1981) ("The Act requires affirmative preservation of an endangered species").

As it relates to the *New York Coastal Partnership* case, even assuming that the DOE and ACE were subject to a broad statutory duty to conserve the Fire Island Piping Plovers, this duty could not reasonably be interpreted as requiring the defendants to approve and implement the proposed interim shore erosion plan.  For the reasons outlined above, the court found that the plan was unduly speculative, and, therefore, neither likely to redress the plaintiffs' immediate injury, namely, shoreline erosion, nor any potential consequential injuries, such as possible destruction of the birds' nesting habitats.

By contrast, in this case, it is plausible to believe that the Commissioner's broad duty to conserve the Piping Plovers at Jones Beach may include actions to lessen the risk of predation by removing non-native feral cats and preventing members of the public from re-establishing feral cat

colonies in the future.   As discussed above, in the Court's view, it is also plausible that such measures would likely redress the Plaintiff's aesthetic and recreational interest in the birds.

Accordingly, the Court finds that the complaint sufficiently alleges that the relief sought would likely redress the injuries of which the Plaintiffs complain.   Thus, having found that the Plaintiffs plausibly alleged their standing to maintain this action, the Court denies the Commissioner's motion to dismiss the complaint under FED. R. CIV. P. 12(b)(1).

**D.     As to Whether the Complaint Plausibly States a Violation of the Endangered Species Act**

The Commissioner sets forth two arguments challenging the facial sufficiency of the Plaintiffs' complaint, both of which are materially indistinguishable from her arguments regarding standing, which were discussed at length above.

In particular, harkening back to her argument challenging the injury-in-fact element of the Article III inquiry, and again noting that the complaint does not specifically allege any examples of actual harm befalling the Jones Beach Piping Plovers, the Commissioner contends that the complaint fails to plausibly allege a "taking" of the species.   Further, the Commissioner substantially reiterates her argument regarding redressability, contending that the complaint fails to state a claim for relief because the Parks Office is under no specific statutory authority to remove the feral cats from Jones Beach and/or prevent members of the public from re-establishing similar colonies.

The Court has already resolved these issues in evaluating the Plaintiffs' standing to maintain this suit, and need not address them again here.   Rather, it is sufficient to repeat that, for substantially the same reasons as set forth above, the Court finds that these arguments lack merit.

The only "new" argument the Commissioner makes in support of dismissal under Rule 12(b)(6) is that the complaint fails to plausibly allege so-called "population-level mortality."   Under this theory, in order to state a claim for a "taking" under the Endangered Species Act, the Plaintiffs would be required to allege facts supporting a plausible inference that the challenged actions are

resulting in harm to the overall Piping Plover population, rather than simply harm to individual members of the species at Jones Beach. However, this argument also lacks merit.

The case relied upon by the Commissioner, *Coalition v. McCamman*, 725 F. Supp. 2d 1162 (E.D. Ca. 2010), is factually distinguishable. There, proof of population-level mortality was appropriate given that "the Section 9 claim in [that] case focuse[d] on a habitat modification theory that affect[ed] the entire population of the listed species." *Id.* at 1196. However, since the Plaintiffs' claim in this case focuses on a discrete local population of Piping Plovers, rather than the entire listed species, the rule from *Coalition* has no application. Nor does the Plaintiff identify any legal authority to support an expansion of the *Coalition* holding to the facts of this case.

Accordingly, the Court denies the Commissioner's motion to dismiss the complaint under FED. R. CIV. P. 12(b)(6).

### III.   CONCLUSION

Based on the foregoing, the Commissioner's motion to dismiss the complaint is denied in its entirety. The Commissioner is directed to file an answer to the complaint within 20 days of the date of this order.

It is **SO ORDERED:**

Dated:   Central Islip, New York
          February 6, 2017                   */s/ Arthur D. Spatt*
                                             ARTHUR D. SPATT
                                             United States District Judge